## In re BRONSTEIN.

### (District Court, S. D. New York. January, 1910.)

1. BANKRUPTCY (§ 241*)—FALSE SWEARING—WITNESSES—STATUTES—CONSTRUCTION—"PERSON."

Under Bankr. Act July 1, 1898, c. 541, § 41, 30 Stat. 556 (U. S. Comp. St. 1901, p. 3437), providing that certain acts committed by any "person" before a referee in bankruptcy shall constitute a contempt of court, the word "person" is not limited to the bankrupt, but extends to a witness guilty of perjury before the referee.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 241.*

For other definitions, see Words and Phrases, vol. 6, pp. 5322–5335; vol. 8, p. 7752.]

2. BANKRUPTCY (§ 241*)—CONTEMPT—PUNISHMENT.

Bankr. Act July 1, 1898, c. 541, § 2 (16), 30 Stat. 545 (U. S. Comp. St. 1901, p. 3421), empowering the court to punish persons for contempts committed before referees, authorizes punishment as for contempt of a witness who has committed perjury in bankruptcy proceedings before a referee; the same power being also conferred on the court by Rev. St. U. S. § 725 (U. S. Comp. St. 1901, p. 583).

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 241.*]

In the matter of bankruptcy proceedings of Harris Bronstein. Proceedings to punish one Julius Mendes for contempt for false swearing and perjury. On certificate of referee. Order directing punishment affirmed.

The following is the certificate of Dexter, Referee:

To the Honorable United States District Judges:

The undersigned, Stanley W. Dexter, one of the referees in bankruptcy of this court, hereby certifies the following facts, with his opinion thereon, for action, pursuant to section 41 of the bankruptcy act:

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

A petition in bankruptcy was filed against Harris Bronstein on March 15, 1909, and William Ford Upson, Esq., appointed receiver. Such proceedings were thereafter had that an order of adjudication was made by the District Judge on April 7, 1909, and the matter referred to the undersigned, as referee in charge, to take all further proceedings. The bankrupt filed schedules on April 30, 1909, showing total liabilities of $58,200 and nominal assets of $135,-787. Of these nominal assets $119,000 was the estimated value of certain real estate, none of which has been realized on, as the same appears to be heavily mortgaged; $3,000 was given as the value of the stock in trade; and $11,537, the debts due on open account. From the receiver's report, all that he was able to collect from these assets was the sum of $1,341.46. The schedules further show that the bankrupt purchased, within a few months prior to his bankruptcy, merchandise of the value of upwards of $46,000, little or none of which was turned over to the receiver or trustee. On May 21, 1909, the first meeting of creditors was held, and Mr. Upson elected trustee, and on June 10th and on subsequent occasions the bankrupt was examined with reference to the disappearance of his assets.

On September 8, 1909, on the petition of the attorney for the trustee, an order was obtained for the issue of subpœna requiring the attendance and examination of one Julius Mendes under section 21a of the bankruptcy act; and on December 2d a similar order was obtained for the examination of one Rose Bronstein, the bankrupt's daughter. Other orders were obtained requiring the examination of other witnesses shown to be closely connected with the bankrupt, and their depositions were taken. On December 29, 1909, the witness Julius Mendes attended at the referee's office and was duly sworn and examined by Mr. Rosenberg on behalf of the trustee, and, his examination not having been concluded, the same was adjourned until December 30th, and then continued. On January 5, 1910, Mendes again attended before the referee and read over his testimony and subscribed and swore to the same. Herewith is submitted a stenographic record of the examination of December 29th and 30th, to which the particular attention of the court is called.

It is sufficient for the purposes of this certificate to state that the record of this examination shows such remarkable contradictions and perjurious statements as to constitute a deliberate contempt on the part of the witness. It had appeared by the previous examination that one Rose Bronstein, a daughter of the bankrupt—a young girl not over 19 years of age—had opened a small store on First avenue shortly after the bankruptcy in her own name, and is conducting business there, assisted by her mother. She testified that she had received the money with which she bought this store from her uncle, Julius Mendes, as a loan, and Mendes was examined in reference to that transaction. He was asked on December 29th (page 488): "Q. Did you keep a bank account? A. No sir. Q. Did you ever? A. No, sir; at the time when I was in Philadelphia." He testified that during the year 1909 he was in the newspaper business in New York; that he had abandoned the store in Philadelphia and closed it up after a few months owing to losses. He testified that he was a brother of the bankrupt's wife and uncle of Rose Bronstein, and that he loaned her in cash about April or May, 1909, altogether about $900.

Efforts to ascertain where he got this money were made, but his testimony in that respect was vague and unconvincing. He insisted that over $300 of this money he had in his pocket at the time he gave it to his niece, and that he had no bank account at that time; that he was now conducting a little stationery store in Newark. He was then informed, as was the fact, that the bankrupt in this proceeding had been arrested, charged with concealing assets from his creditors. He admitted that some of the money he gave Rose had been left with Mrs. Bronstein (page 508) to take care of, but he could not remember the amount. Then at page 509 occurs the unusual and extraordinary retraction which is the subject of this certificate. He was asked if he wished to correct his testimony, and made the surprising statement: "If I told you I gave her some money, I did not give her any money. Even as I told you, she is in trouble, and, of course, I would help her if I could. I could not help it." After some rambling explanations, he states, at page 511: "There is nothing extraordinary about it. I merely thought this would not bring me into more trouble than that; that is all." Then at page 517 he was addressed personally

by the referee in regard to this correction of his testimony, and he then stated that his last statement was correct, and that he had made no loan at all. At the close of this examination the witness was directed to return at 4 o'clock the following afternoon for the purpose of signing his deposition.

At a later hour the same day Rose Bronstein was called as a witness, and was then informed that Julius Mendes had testified that he had not made the loan to her, and asked what explanation she had to make. She then stated, at page 520: "I do not doubt your statement, Mr. Rosenberg, but he surely could not have been sane and testified anything like this, for we have every proof, we have the checks; that is, we have the checks he gave us. We have his check book, and the bank; we have many things to prove." Then, asked by the referee if she still wished to stick to that story in spite of Mendes' testimony, she replied: "Yes, by all means. Did he sign his testimony?" She was then informed that he did not sign his testimony, but swore to it before the referee, and she was then cautioned by the referee to think the matter over carefully and be prepared to testify the following day.

On December 30th the witness Mendes returned, and was then represented by Mr. Friedar (from the office of the bankrupt's attorney), who stated that the witness had testified to something he did not intend to testify to, and asked for an adjournment for the purpose of reading over his testimony. The referee then directed the hearing to proceed, and the witness Mendes was then recalled, and asked if he wished to change his testimony. He then stated (page 556) that he was very nervous and excited when he testified the last time; that it was true he gave $900 to his niece, and that he did not take it seriously until after the examination, when he went over to see his sister and saw the trouble he had made. He then reiterated the testimony, first given by him, that he had loaned his niece the $900. Asked by Mr. Rosenberg whether he had loaned the money in cash or by check, he answered: "My yesterday's testimony, I cannot tell you anything, as I was nervous. I do not know anything about that. I do not know what I said. Q. You say now, don't you, that you loaned it by two checks which you have produced? A. Yes, sir." The two checks were then produced by the witness and offered in evidence—one being dated April 8, 1909, drawn on Joseph S. Marcus, banker, to the order of Rose Bronstein for $600, and certified and indorsed by Rose Bronstein; the other being dated April 15th, on the same banker, for $300, to the same order, and similarly certified and indorsed.

Mendes testified that he had opened that account on April 7th, or a day previous to the drawing of the first check; that he had deposited $1,300, but denied that the money had been given to him by Bronstein. He admitted that he had seen Mrs. Bronstein the day before (December 29th) and told her about the whole matter of his examination. He then saw the bankrupt's attorney, to whom he was referred by Mrs. Bronstein. The witness was in a pitiable condition, weeping and excited on this examination, but stuck to his second retraction in spite of the fact that he was warned by the referee (page 566) that the matter would be certified to the court for summary treatment.

The impression made on the referee by the demeanor of the witness and his conflicting and contradictory and garbled testimony was that he was endeavoring to conceal the truth of the transaction, and that he was being used as a tool by the bankrupt and his more clever allies. It would be impossible to indicate in the scope of this certificate all the facts of this extraordinary case, but sufficient is shown by the testimony of this witness to warrant summary action by the court. The entire record of the various examinations conducted herein, in which many witnesses have been examined, discloses a deliberate conspiracy to defraud creditors, and the bankrupt's minor daughter has been used as a dummy to hold some of the property. The checks produced by the witness Mendes, except for the signature, are in the handwriting of Rose Bronstein, and the account seems to have been closed shortly after the Bronstein transaction. The witness claimed in his later testimony that he had been threatened by counsel and frightened into testifying to facts which were not the truth; but this is palpably untrue. The referee himself examined the witness on both occasions, and cautioned him as to the seriousness of the situation. The excitement of which he speaks was more apparent on the occasion of his second retraction than on his former examination, and

352 182 FEDERAL REPORTER.

it was evident that he was under a great mental strain in withdrawing his previous statements.

On December 31st the referee granted an order to show cause why the witness Mendes and other parties should not be certified for contempt, as prayed for in the petition of the trustee herein. This order was served on Mendes personally, and he attended before the referee on the return date thereof, and at sundry adjourned dates, and when asked to explain his conduct he again pleaded excitement, and failure to understand, and yielding to threats of counsel. I certify that the witness has had full notice of the application, and was given an opportunity to employ counsel, but has not done so. The order to show cause is returned herewith for the information of the court.

## Conclusions of Law.

I further certify that the said Julius Mendes in the proceedings before the undersigned referee (1) did on December 29, 1909, and on December 30, 1909, misbehave during said hearings so as to obstruct the same and impede the administration of justice, in that he willfully refused and still refuses to give full, connected, reasonable, and truthful answers to questions properly propounded to him concerning the acts, conduct, and property of the bankrupt herein, and made false and contradictory sworn statements and retractions when under examination pursuant to section 21a of the bankruptcy act; (2) did on December 29, and again on December 30, 1909, after having taken the oath, refuse to be examined before the referee according to law, viz., section 21a of the bankruptcy act, in that he willfully refused and still refuses to give full, connected, reasonable, and truthful answers to questions properly propounded to him concerning the acts, conduct, and property of the bankrupt herein, and made false and contradictory sworn statements and retractions when under examination pursuant to section 21a of the bankruptcy act; (3) that such misbehavior and refusal to answer according to law are contrary to the statute in such case made and provided, viz., section 41 of the bankruptcy act, and are punishable in the same manner as contempts committed in the presence of the court.

## Opinion.

The original testimony of the witness, a brother-in-law of the bankrupt, and unsuccessful in business, that he loaned $900 to his niece, the bankrupt's daughter, a girl of not more than 19 years of age, in cash, to open a small store, was so incredible on its face that, in the absence of strong corroboration, it would have been disregarded in any court of justice. At the same examination the witness, apparently realizing the flimsiness of his story, broke down, and in the presence of the referee, and in answer to questions propounded by the referee himself, he deliberately retracted his prior testimony. If he had then and there signed his deposition, his inconsistent conduct might have been overlooked, as due to a change of heart and a belated desire to testify truthfully, and he might then be regarded as having thereby purged his contempt. Matter of Gordon (D. C., N. Y.) 21 Am. Bankr. Rep. 290, 167 Fed. 239.

But overnight he experienced another change of mind, after admitted conferences with the bankrupt's wife and the attorney for the bankrupt, and proceeded to retract his retraction of the day before. He then for the first time produced two checks purporting to show the payment of the money to Rose Bronstein, although he had never referred to that mode of payment previously. The checks were produced by the witness; but every indication pointed to the fact that they had been obviously prepared to bolster up the witness' story, but had been overlooked by him. The signature on the checks alone was his; the body of the checks being in the handwriting of Rose Bronstein. The transcript of the banker's account subsequently produced showed that the account had been opened about the time of the check transaction and soon closed. "It is not, however, necessary," as is well stated by Judge Hough, in Re Fellerman (D. C., N. Y.) 17 Am. Bankr. Rep. 785, 790, 149 Fed. 244, "to allege or prove with the strictness of criminal practice or by laxer methods particular instances of false swearing, demonstrating the falsity by proving the truth."

The inherent improbability of the first story, the conscience-stricken demeanor of the witness at his first retraction, the evident effect of pressure exerted on him during the adjournment to protect his relatives, the pitiable exhibition which he made before the referee on his second retraction, and his entire failure to appreciate the enormity of his conduct, are convincing evidence of his being a poor, weak tool in the hands of clever schemers engaged in a conspiracy to obstruct the administration of the bankruptcy act. Unless such conduct can meet at the hands of the court some punishment, the examination of fraudulent bankrupts and their suborned witnesses will become a farce, and the referee reduced to a mere examiner, whose absence of power to deal summarily with such flagrant cases tends to deprive that office of the respect due to an important branch of the bankruptcy court.

The authorities are uniform that testifying falsely or intentionally, vaguely, and contradictorily, constitutes a contempt of court under section 41. Matter of Bick (C. C., N. Y.) 19 Am. Bankr. Rep. 68, 155 Fed. 908; Matter of Gordon (D. C., N. Y.) 21 Am. Bankr. Rep. 290, 167 Fed. 239; Matter of Schulman (D. C., N. Y.) 21 Am. Bankr. Rep. 288, 167 Fed. 237; Matter of Gitkin (D. C., Pa.) 21 Am. Bankr. Rep. 113, 164 Fed. 71; Matter of Singer (D. C., Pa.) 23 Am. Bankr. Rep. 28, 174 Fed. 208. These were cases of such contempts committed by the bankrupt; but the statute (section 41) does not limit contempt proceedings to the bankrupt only, but includes any "person"; and section 2 (16) empowers the court to "punish persons for contempts committed before referees." The same power is conferred upon the court by section 725 of the United States Revised Statutes (U. S. Comp. St. 1901, p. 583).

All of which is respectfully certified.

Abram I. Elkus and James N. Rosenberg, for trustee.
Samuel S. Koenig, for witness.

HOUGH, District Judge. Affirmed.